**SO ORDERED: January 04, 2008.**

**James K. Coachys**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JASON W. LEMEN, | ) | Case No. 07-06206-JKC-7 |
| | ) | |
| Debtor. | ) | |

### ORDER ON UNITED STATES TRUSTEE'S MOTION TO DISMISS

This matter came before the Court on the United States Trustee's (the "Trustee") Motion to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(3) (the "Motion") and Debtor Jason W. Lemen's ("Debtor") Objection thereto. Following hearings on October 24, 2007 and December 19, 2007, the Court took the matter under advisement and now issues the following Order.

Debtor filed a Chapter 7 bankruptcy petition on July 3, 2007. According to Schedule J, Debtor receives $5,416.67 per month from his employer, Pro-Pack, Inc., and an additional $2,750.00[1] in income from two rental properties. One of those properties, located at 6695 Broadway Street in Indianapolis (the "Broadway Property"), is owned by Debtor and the other, located at 421

---

[1] According to Form 22A, in the six months leading up to the bankruptcy, Debtor earned $2,150.00 in rental income per month. He has since increased the rent for one of the properties.

East 48th Street in Indianapolis (the "48th Street Property") is owned by Debtor's wife. Schedule J also indicates that Debtor's wife nets approximately $1,000.00 per month in additional income. They do not have any dependents.

Debtor's residence is located at 8201 North Meridian Street in Indianapolis, Indiana (the "Residence") and is purportedly worth $450,000.00. The Residence has four bedrooms, 2 ½ baths, a 3-car garage and sits on .8 acres. The Residence carries two mortgages in the combined amount of $534,507.68.[2] According to Subpart C of Form 22A: Deductions for Debt Payment ("Subpart C"), Debtor's monthly mortgage payment totals $4,051.52.

Debtor's first mortgage with Chevy Chase Bank, however, is an adjustable rate loan with a "negative amortization." Contrary to the $3,051.62 listed on Subpart C as the "average monthly payment" to Chevy Chase, Debtor testified that he is actually been paying approximately $2,000.00 each month on the first mortgage, which is over $1,000.00 less than the interest that accumulates each month on the loan and almost $1,500.00 less than what a principal and interest payment on the loan would be. In other words, not only is Debtor not building any equity in the Residence, his indebtedness on the first mortgage is increasing every month.[3]

The Broadway Property is purportedly worth $145,000.00 and carries three mortgages, with a total monthly payment according to Subpart C of $1,877.53. The first mortgage with Chevy Chase

---

[2] The Residence also carries a third mortgage in an unspecified amount by the United States Small Business Association (the "SBA"). This mortgage appears to cross-collateralize the mortgage SBA holds on the Broadway Property.

[3] The amounts listed in Subpart C for the first mortgages on the Residence and the Broadway and 48th Street Properties reflect the amount due under each loan for a principal and interest payment. Notwithstanding those figures, all three mortgages are negative amortization loans, and the payments Debtor is actually making, as detailed herein, are significantly lower. Schedule J appears to reflect these lower payments. Even by factoring in the actual amounts Debtor has historically paid on the loans, the presumption of abuse does not apply.

Bank is also a negative amortization loan and, according to Schedule J, he actually pays $1,011.00 each month on the loan.  Accordingly, Debtor's indebtedness on the Broadway Property is also increasing each month.  The monthly rental income from the Broadway Property is currently $1,500.00.  Chevy Chase also holds the first and only mortgage on the 48th Street Property.  It, too, is a negative amortization loan.  The monthly mortgage payment listed in Subpart C for the loan is $1,438.55, while the monthly rental income is $1,250.00.  According to Schedule J, Debtor's monthly payment is actually $1,064.00.[4]

Schedule F indicates that Debtor has over $205,000.00 in unsecured, nonpriority debts, almost all in the form of credit card balances.[5]  The debts include over $30,000.00 to American Express that is the subject of a pending nondischargeability action under 11 U.S.C. § 523(a)(2). American Express's complaint details a long list of charges made for luxury items and travel in the months immediately preceding the bankruptcy.  In 2004, Debtor's wife filed for bankruptcy and received a discharge of over $103,000.00 in unsecured debt, most if it also in the form of credit card balances.  The couple was divorced at the time but has since remarried.

Section 707(b)(1) of the United States Bankruptcy Code provides that a court may dismiss a case of an individual debtor whose debts are primarily consumer debts "if it finds that the granting

---

[4]   While the 48th Street Property is not listed on Schedule A as an asset of the estate, Debtor listed a secured claim to Chevy Chase Bank on Schedule D with respect to the Property.  As previously stated, he also listed the monthly mortgage payment of $1,438.55 on Subpart C.  While the property itself is titled in Debtor's wife's name, the Court presumes that Debtor is also obligated on the promissory note to Chevy Chase Bank.  Nevertheless, Debtor's indebtedness to the bank is unsecured and should have been listed as such on Schedule F, rather than on Schedule D.  Similarly, Debtor should not have included the mortgage payment on Subpart C.  The Court notes, however, that even if this mortgage payment had not been included in Subpart C, the presumption of abuse would still not apply.

[5]   According to Schedule F, Debtor is carrying balances on 21 different credit cards.  In her bankruptcy, Debtor's wife discharged balances on 17 different credit cards.

of relief would be an abuse of the provisions of this chapter. Section 707(b)(2) sets forth a "means test" to determine whether a "presumption of abuse" arises. Here, the presumption of abuse does not arise as Debtor does not have any disposable income according to Form 22A. The Trustee does not dispute Debtor's mean test calculations but has, instead, moved to dismiss the case under § 707(b)(3).

> That section provides in relevant part:
>
> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph [(A)(i)] of such paragraph does not arise or is rebutted, the court shall consider–
> (A) whether the debtor filed the petition in bad faith; or
> (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

In analyzing a case under § 707(b)(3), courts have typically considered the following factors: Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay; whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect his true financial condition; whether the debtor enjoys a stable source of future income; whether he is eligible for adjustment of his debts through Chapter 13; whether there are state remedies with the potential to ease his financial predicament; the degree of relief obtainable through private negotiations; whether his expenses can be significantly reduced without depriving him of adequate food, clothing, shelter, and other necessities; and whether the petition was filed in good faith. *See, e.g., In re Penny*, 297 B.R. 737 (Bankr.C.D.Ill.2003).

As previously indicated, Debtor has a significant amount of credit card debt. His indebtedness to American Express, as detailed in its complaint against him, suggests to the Court that at least a portion of that indebtedness is related to luxury items, electronics, home furnishings,

clothing, travel and the like.  The Court is much more troubled, however, by the amount Debtor is

currently devoting to service his secured indebtedness.

According to Debtor's own figures on Subpart C, his monthly secured debt payments

actually *exceed* his current monthly income.  While the figures for Subpart C do not reflect the

amounts Debtor is actually paying on the negative amortization loans held by Chevy Chase Bank

on each of the properties, the actual payments are still substantial and consume over half his monthly

income.  In particular, the median housing expense in Indianapolis for a family of two is $841.00,

yet Debtor pays almost four times that amount each month for the Residence.  The Court assumes

that Debtor could secure an adequate home or apartment for far less money.  Debtor claims an

emotional attachment to the Residence, but he and his wife have lived there a relatively short period

of time, and they do not have any children who might be impacted by moving or changing schools.

In addition to the sheer amount of the payments relative to Debtor's income, the Court is

further troubled by the fact that Debtor can apparently afford to pay only the bare minimum to

Chevy Chase Bank and, as a result, is going further and further into debt while not building any

equity in any of his properties.  Furthermore, the rental income for both the Broadway and 48th Street

Properties is insufficient to even cover the full amount due under the mortgage loans.  From the

Courts' perspective, then, retention of these properties does not make financial sense.

Debtor has not faced any type of calamity, such as a job loss or illness.  Instead, he has

voluntarily chosen to live well beyond his financial means.  That, in and of itself, is not particularly

unusual among debtors.  However, he has also failed to demonstrate to this Court that he is prepared

to alter his lifestyle in any significant way to avoid further indebtedness.  Debtor insists that the

Court should not police the lifestyles of its debtors.  To a certain degree, the Court agrees with that

proposition and generally resists nickel and diming a debtor's expenses.  That said, a debtor may

invite more rigorous judicial scrutiny if his expenses are objectively high or in excess of what the

debtor can seemingly afford.  In such instances, the Court can and should police a debtor's lifestyle

if necessary to prevent abuse, and such action is certainly not unprecedented.  *See, e.g.,  Cox v.*

*Fokkena (In re Cox)*, 315 B.R. 850 (8th Cir. BAP 2004) (affirming bankruptcy court's conclusion

that Chapter 7 debtors' current housing expense of $3,400.00 per month was not reasonable and had

to be reduced for purposes of determining ability to fund Chapter 13 plan); *In re Nissen*, 2007 WL

2915648 (Bankr.D.Neb.2007) (abuse found where debtors were devoting 82% of income to

mortgage payments); *In re O'Brien*, 2007 WL 1847390 (Bankr.N.D.Ohio 2007) (finding of abuse

where debtor's had a monthly mortgage expense of $2,400.00);  *In re Cook*, 110 B.R. 544

(Bankr.N.D.Okla.1990) (substantial abuse indicated where debtors were spending $2,006.00 per

month on housing for a family of three).

Debtor's insistence on retaining the Residence and the Broadway and 48th Street Properties,

despite the fact that he seemingly cannot afford them, suggests to the Court some degree of bad

faith.  *See In re Griffieth*, 209 B.R. 823, 826 (Bankr.N.D.N.Y.1996) (decision to discharge debt

rather than make any adjustments to expansive lifestyle may be evidence of bad faith) (citing *Ins.*

*Serv's, Inc. v. Zick (In re Zick)*, 931 F.2d 1124 (6th Cir.1991) and *In re Davidoff*, 185 B.R. 631

(Bankr.S.D.Fl.1995)).  Without sufficient income, the Court assumes that Debtor and his wife will

continue to fund their lifestyle through the use of credit cards and, even with the benefit of a

discharge, will not measurably improve their financial situation.[6]  Debtor testified that he wants to

---

[6] The fact that Debtor persisted in maintaining his lifestyle after his wife's own bankruptcy–in which she discharged a significant amount of credit card debt– is evidence of this.

improve the Residence with the hope of eventually selling it when the housing market improves. It is unclear how he could possibly fund such work. He also testified that he will be able to earn additional income with a recently acquired real estate license. Given the current real estate market and the amount of Debtor's current indebtedness, neither strategy makes much sense to the Court.

Under the totality of these circumstances, the Court finds granting a discharge in this case would be an abuse of the Bankruptcy Code and it, therefore, grants the Trustee's Motion to Dismiss. The Court notes that Debtor appears to be over 11 U.S.C. § 109(e)'s debt limits for Chapter 13. He is, however, presumably entitled to proceed under Chapter 11 of the Code. As such, the Court gives Debtor thirty days in which to convert this case. If he chooses not to, the case shall be dismissed without further notice or hearing.

###

Distribution:

David R. Krebs
United States Trustee